No. 72,776

STATE OF KANSAS, *Appellee*, v. DARRICK S. HARRIS, *Appellant*.

(915 P.2d 758)

Opinion filed April 19, 1996.

*Carl E. Cornwell,* of Overland Park, argued the cause, and *Lindsey P. Erickson,* of Overland Park, was on the brief for appellant.

*Frank E. Kohl,* county attorney, argued the cause, and *Carla J. Stovall,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Darrick S. Harris appeals from his convictions and sentence for one count of first-degree murder and one count of aggravated battery of a law enforcement officer. He contends the trial court erred in several matters involving admissibility of evidence, jury instructions, and further contends that there was lack of proper notice by the prosecutor on his hard 40 sentence. Finding no reversible error, we affirm.

This case centers around a disturbance in the recreation shack at the Lansing Correctional Facility on May 22, 1993, in which one corrections officer, Mark Avery, was killed and another corrections officer, Michael Bidatsch, was severely injured. For his part in the disturbance, the defendant was charged with one count of first-degree murder and one count of aggravated battery against a law enforcement officer.

The defendant was arraigned on November 12, 1993. The State filed with the court notice that it would be proceeding "under K.S.A. 21-4622 [*sic*]" and that notice of its intent had been provided to the defendant and the defendant's attorney.

During voir dire, the State used one of its peremptory challenges to remove Chester Lewis, Jr., a black juror. When asked to supply a race-neutral reason for the strike, the State responded that the juror in question had lied on his juror questionnaire. According to the State, Lewis had stated in his questionnaire that no members of his immediate family had been a party in a civil or criminal case when in reality several criminal actions had been filed against a number of members in his immediate family. The defendant's attorney protested that this information had not been brought out during voir dire and that there were no facts to back up the assertion that the juror had lied. Nevertheless, the court allowed the peremptory strike, concluding that the Lewis family was well known to the court and that it would take judicial notice of its records.

The State called Officer Mike Bidatsch, one of the victims of the attack. Officer Bidatsch testified that he was working the recreation yard with three other corrections officers, including the murder victim, Officer Mark Avery, on the day of the attack. According to Officer Bidatsch, most of the inmates were inside the recreation shack that day because it was raining. However, Officer Bidatsch noticed that a group of Mexican inmates was in the softball dugout outside the recreation shack. He was surprised because this group usually played pool during rainy days on a specific pool table in the recreation shack. On this particular day, however, there was another group of inmates playing at that table.

Officer Bidatsch was standing inside the recreation shack by the ice machine when an inmate came up to him and inquired about the time. Officer Bidatsch told him that it was 3:05 p.m. Suddenly, Officer Bidatsch noticed an inmate named Chris Davis throwing a 5-pound weight plate in his direction. The plate hit Officer Bidatsch on the top of his head, bounced off, and struck an inmate named Reich in the face. Officer Bidatsch testified that the blow knocked him to his hands and knees. He reached for his radio, but it was not there so he got up and began chasing Davis.

Davis ran into the weight pit area and was lost in the crowd of inmates. As Officer Bidatsch went back to the main area, he was attacked by a group of inmates. As he was fighting them off, he was struck on the jaw and fell to the ground. Officer Bidatsch stated that he was able to crawl to a ping-pong table, but as he tried to get up, an inmate he identified as the defendant came up to him and kicked him twice in the ribs. Officer Bidatsch testified that he managed to crawl around the corner but in doing so he was struck on the head by a pool ball thrown by one of the inmates. Officer Bidatsch was able to crawl out the recreation shack door to safety.

Officer Bidatsch stated that he was in intensive care at Providence Medical Center for 3 days as a result of injuries suffered in the attack. He was unaware until told later by investigators that Officer Avery had also been attacked.

Officer Ronald Clark, another officer working in the recreation yard during the incident, testified that there were approximately 400-450 inmates in the recreation shack. Officer Clark noticed that

on that particular day, a gang called the Vice Lords were playing at a pool table usually used by a Mexican gang and the Mexican gang was sitting outside the recreation shack in a baseball dugout. He felt that this was strange and told Officer Avery to keep an eye on the Vice Lords. He stated that several of the Vice Lords had been put into segregation in February and that the Vice Lords were edgy because of pressure that the guards were exerting on them. Officer Clark stated that the guards were strictly monitoring the Vice Lords, including the defendant, who was a member of the gang.

Officer Clark was outside the recreation shack releasing an inmate from the yard to go back to his cell when he heard the alarm inside the recreation shack go off. He ran to the door of the shack but could not get in because of the mass of inmates just inside the door. Although he could not get in, he was able to see Officer Bidatsch attempt to rise from the floor and another inmate, Clifford Scales, hit him and knock him back down. He could not see Officer Avery although he did notice the defendant in the area where Avery was later found.

When other officers arrived, they were able to enter the recreation shack, where they found Officer Avery lying face down on the concrete in a pool of blood. Officer Clark and other officers carried Officer Avery to the clinic. At the clinic, Officer Bidatsch told him that Chris Davis had participated in the attack. Officer Clark then ordered that the Vice Lords be rounded up and put in confinement within the institution. He stated that he did this because the Vice Lords had previously threatened officers, including himself. Defense counsel objected to Officer Clark's statement, claiming that it was a statement concerning prior bad acts in violation of K.S.A. 60-455. The court overruled the objection.

Tyrone Looney, an inmate, testified on behalf of the State. He stated that in early 1993, prior to the incident, he sometimes associated with the Vice Lords and was present when a conversation occurred between several members of the Vice Lords, an inmate called G-Money, an inmate called Valentine, and the defendant. Looney testified that during this conversation, there was talk about the fact that the prison guards were harassing the Vice Lords. The

defendant's attorney lodged a hearsay objection to any statements made during the conversation.

Earlier, outside the presence of the jury, the defense counsel had objected to the expected testimony of Looney on the grounds that it was hearsay. Further, the defense counsel objected on the grounds that there was no evidence that the defendant had made any statements during the conversation or that he had adopted statements made by someone else. The trial court ruled that Looney's anticipated statements were not offered to prove the truth of the matter asserted but merely offered to show that they had been said, and overruled the objection. The judge likewise overruled the objection when it was made in the presence of the jury.

Looney explained that both G-Money and Valentine were upset because the guards were "cracking down" on the Vice Lords. Looney stated that the defendant, whom he called "Yellow," was simply standing there "look[ing] mean." During this conversation, G-Money and Valentine discussed "getting even" with the guards.

Michael Madison, another inmate, was called by the State and testified that he was in the recreation shack when the incident occurred. Madison stated he was playing poker when he heard inmate Reich fall to the floor. Madison saw Officer Avery attempt to help Reich and noticed that several other inmates had attacked Officer Avery. Madison testified that the defendant hit Officer Avery in the head with a 25-pound weight plate and knocked him to the floor. Madison then stated that the defendant hit Officer Avery three more times with the plate and also kicked Officer Avery.

On cross-examination, the defendant's attorney elicited testimony that when Madison first talked to investigators about the incident, Madison had stated that he was looking at Officer Avery's body and saw a halo over Officer Avery's head. According to Madison, a spirit rose out of Officer Avery's body and quoted a Bible passage, Revelations 12:7 three times. Madison also admitted on cross-examination that on an earlier occasion he had been reading the Bible in his cell when the devil spoke to him and told him to quit reading.

Dondie Thomas, another inmate, then took the stand. He was reluctant to testify and asked the court to order him to take the

stand. He stated that he had talked to investigators after the incident and had told them the truth. He testified that he saw the defendant involved in the incident with the officers but he stated: "I'm not going to say I seen [sic] him strike the officers." Thomas said he wanted nothing to do with the case because his life "had been hell" since he had talked to the investigators. He stated that because of his involvement with the case, he was in protective custody away from the general prison population and it has been hard on him. He was given a chance to look at the statement he had previously given to investigators and affirmed that it was true and correct. On cross-examination, he stated that he did not see the defendant lay a hand on Officers Bidatsch and Avery.

The State introduced the written summary of the conversation that Thomas had earlier had with investigators. This summary indicated that Thomas told investigators he had been standing next to the door when he saw a white inmate get hit on the head with a weight. Thomas told investigators that the defendant had used a weight and had beaten both officers.

Byron Wash, another inmate, testified that he had been standing around talking in the recreation shack when he saw an inmate get hit with a weight. Officer Bidatsch attempted to assist the inmate and chased another inmate, who Wash identified as Travis Knighten, into the weight area. Wash stated that Officer Avery then went over to assist the injured inmate and another inmate, Andrew Green, hit Officer Avery with a weight plate. Several other inmates, including the defendant, then began kicking and hitting Officer Avery.

Dr. H.C. Anderson, a forensic pathologist, testified that he had examined the body of Officer Avery. Dr. Anderson testified that Officer Avery's death was caused by numerous blows to the head with blunt objects. Pictures taken of the deceased during Dr. Anderson's autopsy were admitted over the defendant's objection that the photographs were unduly gruesome, prejudicial, and not probative.

The defendant called Kansas Bureau of Investigation (KBI) special agent Timothy Dennis. Dennis testified that during the course

of the investigation, at least four other persons were identified by witnesses as striking one of the officers with a weight plate.

Ronald Martín, an inmate, also testified on behalf of the defendant. Martin testified that he was shooting pool in the recreation shack and saw Officer Bidatsch standing by the ice machine. He noticed Officer Bidatsch duck quickly and saw an inmate who had been standing next to Officer Bidatsch fall to the floor with blood on his face. According the Martin, the whole recreation shack was in an uproar. Martin stated that Officer Bidatsch chased another inmate into the weight pit area and soon came crawling out of the weight room. Martin was certain that the defendant did not kick Officer Bidatsch because the defendant had been playing cards at the corner table and was not in the vicinity. Martin stated that he also saw the persons who battered Officer Avery and while he would not name names, he was positive that the defendant was not one of them.

Martin testified that he was questioned by investigators and they would not believe him when he told them that the defendant was not involved. Martin also testified that Darryl Perrin, a Department of Corrections investigator, pressured him to try to make him give statements against certain inmates, including the defendant.

The defendant testified on his own behalf. According to the defendant, when the incident occurred, he was due to be released in 9 days. The defendant admitted to being a member of the Vice Lords. He further stated that it was common for prisoners to be mad at guards, but he could not recall the specific conversation testified about by Tyrone Looney. He further denied having any part in any plan to injure any of the guards.

The defendant testified that he and another inmate, Chris Davis, went to the recreation shack to play cards and get out of the rain. He and Davis played cards with an inmate called "Little Lord" and another inmate they did not know. The defendant stated that they stopped playing cards because the recreation shack began to fill with people, creating a dangerous situation. Instead, he and Davis sat on the card table and talked.

According to the defendant, while he was sitting on the card table, he saw Andrew Green throw a weight plate at Officer Bi-

datsch and saw Officer Bidatsch fall to the floor. Travis Knighten then began hitting Officer Bidatsch. The defendant testified that Officer Bidatsch then chased Knighten into the weight pit. When Officer Bidatsch came back into the main room, a group of inmates attacked him. Officer Bidatsch was knocked to the ground, and more inmates began hitting and kicking him as he tried to crawl away. The defendant denied ever kicking or hitting Officer Bidatsch.

The defendant stated that he then moved out of the vicinity and saw Officer Avery being attacked by an inmate called EDS, whose real name was Clifford Scales. Scales was armed with a weight plate. The defendant stated that Scales was the only person to hit Officer Avery with a weight plate. He also stated that an inmate named Mathenia was a participant in the attack on Officer Avery.

According to the defendant, some members of the Vice Lords felt that the guards were "cracking down" on them, but he did not. He admitted that Officer Avery once lodged a disciplinary complaint against him for horseplay but stated that he was found innocent of the charge and did not have to do time in segregation.

In rebuttal to the testimony of Ronald Martin, the State called Officer H.R. Woodcock, KBI Agent Jim Woods, and Department of Corrections Investigator Darryl Perrin, all of whom testified that they did not attempt to pressure Martin into testifying against the defendant.

At the conclusion of the evidence, a conference was held regarding jury instructions. Defense counsel objected to the court's planned inclusion of an instruction regarding aiding and abetting, arguing that it was not supported by the evidence. He also asked that the court include an instruction on aggravated battery of a law enforcement officer as a lesser included offense of first-degree murder. His objection was overruled and the request was denied by the court.

The defendant assigns the following eight errors: (1) The court erred in admitting hearsay; (2) the court erred in admitting evidence to show the defendant's participation in those statements; (3) the court erred in allowing testimony of prior bad acts committed by the Vice Lords, (4) the court abused its discretion in

failing to give an instruction on aggravated battery as a lesser included offense of first-degree murder; (5) the court abused its discretion when it permitted the State to use a peremptory challenge to strike a black juror; (6) the State failed to comply with notice requirements regarding intent to pursue the hard 40 sentence; (7) the court abused its discretion in admitting prejudicial and irrelevant photographs of the deceased; and (8) the court abused its discretion in giving an aiding and abetting instruction without sufficient evidence.

## (1) THE ADMISSION OF HEARSAY

The defendant argues that the district court erred in admitting testimony offered by Tyrone Looney that he heard certain members of the Vice Lords, a gang of which the defendant is a member, state in the defendant's presence that they were unhappy that the guards were "cracking down" on them and that they should get even. The defendant contends that these statements were inadmissible hearsay. The State, at trial, argued that the statements were not hearsay because they were not offered to prove the truth of the matter asserted but simply to show that the statements themselves were said. The district court admitted the statements on this basis.

K.S.A. 60-460 states that absent certain exceptions, "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible." The theory behind the hearsay rule is that when a statement is offered as evidence of the truth asserted in it, the credibility of the asserter is the basis for the inference, and therefore the asserter must be subject to cross-examination. 6 Wigmore on Evidence § 1766 (Chadbourn rev. 1976).

However, if such a statement is offered not to prove the truth of the matter asserted but to prove that the statement was made, it is not hearsay and therefore not inadmissible. See *State v. Getz*, 250 Kan. 560, Syl. ¶ 2, 830 P.2d 5 (1992); *State v. Crowley*, 220 Kan. 532, 536-37, 552 P.2d 971 (1976). If relevant, such a statement is admissible through the person who heard it. *State v. Getz*, 250 Kan. 560, Syl. ¶ 2.

This is not the usual case in which statements which would otherwise be hearsay are offered, not to prove the truth of the matter asserted, but merely to show that the statements were said. We have allowed the use of statements which would otherwise be hearsay to show that the defendant's story had changed over time, to show the defendant's state of mind, or to show that a *Miranda* warning was given. See *State v. Wacker*, 253 Kan. 664, 672, 861 P.2d 1272 (1993) (jury informed that statements made by the defendant were not admitted for truth of the matter asserted, but instead to show how the defendant's story changed over time); *State v. Getz*, 250 Kan. at 566-68 (evidence that another person told defendant she owned horses and asked him to help her sell them not admitted for the truth of whether other person had purchased horse, but for proving that defendant thought he had permission to sell the horses); *State v. McClain*, 220 Kan. 80, 82, 551 P.2d 806 (1976) (testimony admitted not to show that the statements in the *Miranda* warning were true, but rather to show that *Miranda* was given). However in this case, the statements were offered by the State as evidence of premeditation on the part of the defendant, and the content of the statements themselves reflect such premeditation.

In *State v. Oliphant*, 210 Kan. 451, 454, 502 P.2d 626 (1972), we identified three types of statements exempted from the hearsay rule when offered, not for the truth of the matter asserted, but without reference to such a truth. These three groups are: (1) those statements material to the case as part of the issue; (2) those statements which are verbal parts of an act; and (3) those statements used circumstantially as giving rise to an indirect inference but not as an assertion to prove the matter asserted. The State argues that the statements made in this case fall under the third categorization used in *Oliphant*. According to the State, the evidence was used indirectly to infer premeditation on the part of the defendant.

However, the only way in which the evidence can be used to infer premeditation on the part of the defendant is if the statements asserted were true, *i.e.*, if the guards were actually cracking down on the Vice Lords and the Vice Lords felt that they should get even. In *Oliphant*, this court held that extrajudicial statements

placing the defendant near the crime scene were hearsay even though the prosecution protested that they were merely introduced to show that the statements were made. 210 Kan. at 454-55. In reaching this conclusion, the court stated:

"In our opinion the utterances were testimonial in character despite the state's protestations that they were not being offered with that in mind. If not offered as tending to establish the defendant's presence in the community as a circumstance bearing on guilt, it would seem highly improbable that the state would have insisted on offering the statements at all." 210 Kan. at 455.

The situation is the same in this case. The fact that the defendant merely heard these statements does not infer premeditation. Instead, the probative value of these statements is that they allow a jury to infer that the Vice Lords were angry and wanted to get even, thus providing a motive and evidence of premeditation. If not to show the truth of the matter asserted, there was no other reason for the State to offer the statements. Under these circumstances the statements were hearsay.

Simply because these statements were hearsay, however, does not mean that reversal is automatic. The admission or the exclusion of evidence is subject to the harmless error rule. *State v. Winston*, 214 Kan. 525, 530, 520 P.2d 1204 (1974). K.S.A. 60-261 provides:

"No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

In this case, there was ample evidence that the Vice Lords were upset with the guards and that the guards were paying special attention to them. The defendant himself admitted that some members of the Vice Lords were upset and felt that the guards were "coming down" on them. Officer Clark also stated that members of the Vice Lords had previously threatened officers. Under these circumstances, the admission of the hearsay statements, although error, was simply cumulative evidence and therefore not reversible error.

## (2) THE ADMISSION OF EVIDENCE SHOWING THE DEFENDANT'S PARTICIPATION IN THE HEARSAY STATEMENTS

In a related issue, the defendant argues that the district court erred in allowing Tyrone Looney to testify that the defendant was standing next to members of the Vice Lords when they were making the aforementioned comments regarding their anger at the guards and their wish to "get even." He argues that there was no showing that he adopted the statements so that they cannot be admissible under the hearsay exception for adoptive admissions.

The defendant's argument is correct in that the hearsay statements could not have been admissible under either the exception for adoptive admissions contained in K.S.A. 60-460(h)(2) or the exception contained in K.S.A. 60-460(i)(2). However, the district court did not use either of those exceptions as a reason for admitting the statements. Instead, the statements were admitted because the district court concluded that they were not hearsay. As stated above, this conclusion was in error. As also stated above, the error was harmless because the evidence contained in the statements was merely cumulative. Therefore, the defendant's argument, while correct, is not sufficient to compel a reversal under the facts of this case.

## (3) TESTIMONY OF PRIOR BAD ACTS COMMITTED BY THE VICE LORDS

The defendant contends that the district court erred in admitting Officer Clark's statement that immediately following the incident he told another officer to round up the Vice Lords and put them in segregation because they had previously threatened officers. The defendant argues that these statements were evidence of prior crimes or wrongdoing and, therefore, not admissible under K.S.A. 60-455 because the State did not file notice of its intent to use prior crimes.

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person com-

mitted another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

However, the district court did not find in its discretion that the evidence was admissible under K.S.A. 60-455 but, rather, found that the evidence was admissible independent of K.S.A. 60-455 because it was not evidence of a crime or civil wrong committed on a specific occasion. Although the statement indicated that some members of the Vice Lords had previously threatened officers, there was no evidence that the defendant himself had ever threatened officers. The purpose of K.S.A. 60-455 is to forbid introduction or crimes or civil wrongs committed by the defendant in a criminal action or party in a civil action for the purpose of showing the party's disposition to commit a crime or civil wrong. In a criminal action, it applies only to the defendant. See *State v. Bryant*, 228 Kan. 239, 245, 613 P.2d 1348 (1980). In this case, the prior actions of the Vice Lords are not the actions of the defendant, and the evidence was properly admissible independent of K.S.A. 60-455.

## (4) THE FAILURE TO GIVE AN INSTRUCTION ON AGGRAVATED BATTERY AS A LESSER-INCLUDED OFFENSE OF FIRST-DEGREE MURDER

The defendant argues that under the facts of his case, aggravated battery is a lesser included offense of first-degree murder which the trial court was duty bound to instruct upon. He contends that the jury could have found that although he might have kicked Officer Avery, his blow was not the cause of Officer Avery's death.

We have held that a criminal defendant has a right to an instruction on all lesser included offenses supported by the evidence at trial so long as (1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory and (2) the evidence at trial does not exclude a theory of guilt on the lesser offense. See *State v. Harmon*, 254 Kan. 87, 92, 865 P.2d 1011 (1993); *State v. Deav-*

*ers*, 252 Kan. 149, 151, 843 P.2d 695 (1992), *cert. denied* 125 L. Ed. 2d 676 (1993).

In essence, the defendant claims that because Byron Wash testified that he saw the defendant kick Officer Avery in the ribs but did not see the defendant otherwise attack Officer Avery, and because Michael Madison's testimony was unbelievable, a reasonable jury could have found that he only kicked Officer Avery. According to the defendant, because Officer Avery died of head wounds, a jury could have found that the defendant was only guilty of aggravated battery of a law enforcement officer rather than first-degree murder.

The defendant bases this argument on the premise that aggravated battery of a law enforcement officer is a lesser included offense of first-degree murder under the second test enunciated in *State v. Fike*, 243 Kan. 365, 368, 757 P.2d 724 (1988). The second test in *Fike* states that a lesser crime may be an included offense of the crime charged if the factual allegations in the charging document and the evidence which must be adduced at trial to prove the crime charged would also necessarily prove the lesser crime.

Under the second prong of *Fike*, as applied to the facts of this case, aggravated battery of a law enforcement officer would be a lesser included offense of first-degree murder because in order to show that the defendant murdered Officer Avery, it is necessary to prove that he battered him. Normally, however, because Officer Avery died as the result of the battery, the offense of aggravated battery of a law enforcement officer necessarily merges with that of first-degree murder. "Where a victim dies from an aggravated battery, a homicide has occurred and the battery merges into the homicide." *State v. Smith*, 245 Kan. 381, 392, 781 P.2d 666 (1989).

The defendant's argument, however, is that a jury could have found that while he did strike the victim, his action did not contribute to the victim's death. In order to prove first-degree murder, the State had to prove that the defendant actually killed Officer Avery. Therefore, according to the defendant, if the jury believed that Officer Avery died as the result of blows struck by other prisoners but not by the defendant, then he is guilty only of aggravated

battery of a law enforcement officer and the offenses would not merge.

The inherent problem with the defendant's argument is that if his blows were a contributing factor in Officer Avery's death, the offenses merge and he is guilty of first-degree murder. If, as he argues, his blows did not contribute to Officer Avery's death, then he is guilty neither of first-degree murder nor of any lesser included offense associated with the count of first-degree murder. Instead, he is guilty of an entirely separate offense of battery of a law enforcement officer. The defendant was not charged with this separate offense. As to the charged offense of first-degree murder, the defendant was either guilty of first-degree murder or a lesser included offense which would necessarily merge with first-degree murder, or was not guilty. Therefore, the district court did not err in refusing to give the defendant's requested jury instruction on aggravated battery of a law enforcement officer as a lesser included offense of first-degree murder.

### (5) THE STATE'S USE OF A PEREMPTORY CHALLENGE TO STRIKE A BLACK JUROR

The defendant contends that the trial court erred in allowing the State to peremptorily strike Chester Lewis, Jr., a black juror. The defendant argues that the racially neutral reason for striking Lewis, that he answered untruthfully on his juror questionnaire, was never actually corroborated and that Lewis was not given a chance to explain his answer.

In *Batson v. Kentucky*, 476 U.S. 79, 89, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), the United States Supreme Court held that striking a black venireperson based on racial grounds or the belief that black jurors will be partial to a black defendant violates the Equal Protection Clause of the United States Constitution. In order to challenge the striking of a venireperson under the *Batson* methodology, the defendant must first make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. If such a showing is made, the burden then shifts to the State to articulate a race-neutral reason for striking the venireperson in question. The court must then determine whether the de-

fendant has carried the burden of proving purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991); *State v. Poole*, 252 Kan. 108, 110, 843 P.2d 689 (1992).

The standard of review to be applied to a district court's ruling that the State did or did not act with discriminatory purpose in exercising its peremptory strike is whether the court abused its discretion. *State v. Walston*, 256 Kan. 372, 373-74, 886 P.2d 349 (1994). Judicial discretion is abused only when exercised in an arbitrary, fanciful, or unreasonable manner, or in other words, when no reasonable person would take the view adopted by the district court. 256 Kan. at 374.

In this case, the court asked the State to supply a race-neutral reason for striking Lewis. The State answered that Lewis had lied on his juror questionnaire, answering no to the question of whether he or any members of his family had been a party to any civil or criminal case. The State informed that court that cases had been filed or were currently on file against a number of Lewis' immediate family. The trial court indicated that both Lewis and his father were known to the court and took judicial notice of its court file pertaining to the cases filed against members of Lewis' family. The court then found that the reason given by the State was race neutral and allowed the strike.

The defendant does not deny that the reason given by the State is facially race neutral. However, he argues that Lewis was never asked during voir dire to explain his answer. According to the defendant, if such questioning had occurred, he would have been able to determine whether the State's belief that Lewis had lied on his questionnaire was accurate or whether Lewis made an unintentional mistake.

At trial, however, the defendant argued only that from the information in the record, he had no way of determining that members of Lewis' family were actually involved in civil or criminal cases and there was no proof of such involvement. The district court took judicial notice of its own files and determined that members of Lewis' family were indeed involved in a pending criminal case. The defendant presents no evidence that the district court erred

in its finding but only argues that proof should have been brought out on the record during voir dire.

The trial court has the responsibility of determining whether the prosecution's given race-neutral reason is merely a pretext for purposeful discrimination, and its finding is accorded great deference on appeal. See *Hernandez v. New York*, 500 U.S. at 364. As stated in *Hernandez*:

"Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding 'largely will turn on evaluation of credibility.' [Citation omitted]. In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutors state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' [Citations omitted]." 500 U.S. at 365.

Without question, the better practice in this case would be for the district court to have made a record and substantiated the State's claim that the witness had made a false statement rather than simply relying on its own knowledge of the persons involved. However, under the particular circumstances of this case, the failure of the district court to do so is not fatal.

The State proffered a reason for the strike that was race neutral. The court found that the State's proffered race-neutral reason was not a pretext for discrimination, and this decision is not one with which no reasonable person would agree. Therefore, the district court did not abuse its discretion in allowing the strike.

### (6) NOTICE REQUIREMENTS REGARDING INTENT TO PURSUE THE HARD 40 SENTENCE

The defendant contends that the State failed to comply with the notice requirements of K.S.A. 1992 Supp. 21-4624 and K.S.A. 60-205(e) when filing its intent to seek the hard 40 sentence. He argues that this failure prevents the State from seeking the hard 40 sentence and, therefore, his sentence should be overturned.

K.S.A. 1992 Supp. 21-4624(1), which was applicable when the defendant committed the crime, provides that where the State in-

tends to seek the hard 40, it must file written notice of that intent with the court and serve such notice on the defendant or the defendant's attorney at the time of arraignment. Absent compliance with this statute, the State is prohibited from requesting the hard 40. K.S.A. 1992 Supp. 21-4624(1).

We have required strict compliance with the statute. In *State v. Peckham*, 255 Kan. 310, 317-18, 875 P.2d 257 (1994), this court noted:

"We are dealing with what in 1992 was this state's equivalent to the death penalty. Thus, the State should follow the statute. Sloppy, incomplete records are insufficient to overcome the statutory mandate that if the State fails to file and serve the notice as required by K.S.A. 1993 Supp. 21-4624(1), the mandatory term of imprisonment of 40 years cannot be imposed."

In *Peckham*, the defendant and his counsel were served with notice of the State's intent to seek the hard 40 sentence 10 minutes prior to arraignment, but a copy of the notice was not file stamped until the following day. Both the district judge and the court reporter remembered that the notice was placed on the judge's bench prior to arraignment. This court stated that although a copy of the notice was placed on the judge's bench, there was no showing that it was placed on the bench with the intention that it would be filed with the court rather than as a courtesy copy. 255 Kan. at 317. As a result, we found that the requirements of 21-4624 had not been met. 255 Kan. at 318. In the same manner, in the recent case of *State v. Collier*, 259 Kan. 346, 913 P.2d 597 (1996), we found that where the record did not show that the State, at the time of the arraignment, filed notice with the district court of its intent to seek the hard 40, the sentence could not be imposed.

The first alleged procedural error of which the defendant complains is similar to the arguments in both *Peckham* and *Collier* in that he argues there is no indication in the arraignment record as to when the State filed the notice or served it to the defendant. When this matter was brought up at the defendant's sentencing hearing, the court remembered that the State had given copies of the notice to the defendant and also handed the notice to the judge to be filed, and that the action was "all simultaneous." A review of the record of the arraignment shows that at the very first, the State

informed the court: "For the record, Your Honor, I would file with the Court notice of the State's intent to proceed under K.S.A. 21-4622 [*sic*]. A copy has been provided to counsel and also to the defendant."

This excerpt from the record indicates that irrespective of the fact that the State mentioned the wrong statute section, the State did in fact give a copy to the court with the intention that it be filed and did give a copy to the defendant. Therefore, the situation is unlike the one which existed in *Peckham*, where there was no indication that the notice was actually given to the court with the intention that it be filed, or the situation in *Collier*, in which there was no indication in the record that the notice was provided to the district court at arraignment. Instead, the record in the case before us clearly indicates that the State intended to file notice with the court and actually did so. See *State v. Williams*, 259 Kan. 432, 913 P.2d 587 (1996).

Once it is established that the State properly served notice to the court with the intent that it be filed, the next question raised by the State's procedure is whether the notice was properly served on the defendant and his counsel. The defendant argues that K.S.A. 1992 Supp. 21-4624 clearly requires that the State must file notice of its intention *prior to serving the defendant*. According to the defendant, serving the defendant simultaneously with or prior to serving notice with the court does not comply with the statute.

K.S.A. 1992 Supp. 21-4624(1) states that "notice shall be filed with the court and served on the defendant or the defendant's attorney at the time of arraignment." This would seem to indicate that the order is not particularly important as long as the service takes place at the time of arraignment. While we did note in *Peckham* that "[t]he filing of the service with the court is a prerequisite to serving the defendant," this statement was made as part of our conclusion that notice to the court could not be filed after arraignment. See 255 Kan. at 316. This does not mean, and the statute does not indicate, that service and filing must be accomplished in a lockstep order so long as both service and filing are accomplished at the time of the arraignment.

Further, we have held that notice and filing of the intent to seek the hard 40 may be accomplished prior to the arraignment. *State v. Richardson*, 256 Kan. 69, 76-77, 883 P.2d 1107 (1994). The purpose of the notice requirement is to make the defendant aware of a hard 40 prospect so as to be in a position to devise his or her strategy. *State v. Bailey*, 251 Kan. 156, 169, 834 P.2d 342 (1992). This purpose is furthered, not hindered, by allowing the defendant to be served with notice prior to the time it is filed with the court. On that basis, both service on the defendant and filing with the court was accomplished in this case.

The next question, one on which the defendant focused at his sentencing hearing, is whether the judge's failure to note on the filed copy the file date is in contravention of the statute. K.S.A. 1992 Supp. 21-4624(1) requires only that notice be filed with the court. The defendant argued at sentencing that the court had failed to follow the provisions of K.S.A. 60-205(e) governing the filing of documents with the court.

K.S.A. 60-205(e) states:

"The filing of pleadings and other papers with the court as required by this article shall be made by filing them with the clerk of the court, except that the judge may permit the papers to be filed with the judge, in which event the judge shall note thereon the filing date and forthwith transmit them to the office of the clerk."

Although K.S.A. 60-250(e) is in the code of civil procedure, it may be considered applicable in criminal proceedings, there being no provision in the criminal procedures to the contrary. *State v. Johnson*, 255 Kan. 140, 155, 871 P.2d 1246 (1994); *State ex rel. Owens v. Hodge*, 230 Kan. 804, 808, 641 P.2d 399 (1982).

At sentencing, the defendant argued that the failure of the court to note the date on the filed copy and to deliver the filed copy to the clerk until 4:10 p.m. that day violated K.S.A. 60-250(e). However, in *Tobin Constr. Co. v. Kemp*, 239 Kan. 430, 435-36, 721 P.2d 278 (1986), we stated:

"K.S.A. 60-205(e) is similar to Rule 5(e) of the Federal Rules of Civil Procedure. Rule 5(e) provides that a judge may permit pleadings and other papers to be filed initially with him prior to their transmission to the clerk's office for entry on the docket sheet. Under this procedure, filing is complete when the judge has custody

of the papers. The judge's failure to forward the papers forthwith or to enter a necessary date does not prejudice the party attempting to comply with the filing requirement."

Therefore, the State's filing of the notice with the judge was all that was necessary to fulfill that part of the requirements of K.S.A. 1992 Supp. 21-4624, and the judge's subsequent failure to file the papers until that afternoon or to note the date filed on the copy does not prevent the State from seeking the hard 40.

This is not a situation, as in *Peckham*, where it was impossible to determine whether the copy was provided to the judge with the intent that it be filed or whether the copy provided to the judge was actually the copy filed. In this case, the record clearly indicates that the State did file the notice with the court and serve notice on the defendant and that the court subsequently filed the notice with the clerk. As a result, there was no violation of K.S.A. 1992 Supp. 21-4624. See *State v. Williams*, 259 Kan. 432.

### (7) THE ADMISSION OF PHOTOGRAPHS OF THE DECEASED

The defendant contends that the trial court abused its discretion in admitting photographs showing the injuries suffered by Officer Avery. The defendant argues that the pictures did not aid the jury in understanding the testimony of Dr. Anderson, the pathologist, and that they were prejudicial.

The admission of photographs in a homicide case is a matter within the trial court's discretion and will not be disturbed absent a showing of abuse of that discretion. *State v. Reed*, 256 Kan. 547, 557, 886 P.2d 854 (1994). While photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence, demonstrative photographs are not inadmissible merely because they are true reproductions of relevant physical facts and material conditions at issue. *State v. Stone*, 253 Kan. 105, 111, 853 P.2d 662 (1993).

While the admission of gruesome photographs is rarely held to be an abuse of discretion, this court has done so in cases where the probative value was slight and the prejudicial effect great. See *State v. Boyd*, 216 Kan. 373, 377-78, 532 P.2d 1064 (1975). In

*Boyd,* we held that the district court abused its discretion in admitting a photograph of a victim laid out like a "disemboweled beef in a packing plant," where the photograph was repetitious and cause of death not in dispute. However, it is well settled that photographs which serve to illustrate the nature or extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death. *State v. Spears,* 246 Kan. 283, 286, 788 P.2d 261 (1990).

The pictures in this case depict the head injuries suffered by Officer Avery. They show the wounds to the officer's head, with some blood, but are not so gruesome as compared to the pictures in *Boyd.* There is no indication that the autopsy had made the pictures any more gruesome than they would be normally. The pictures accurately depict the nature of the injuries suffered and are relevant to the testimony of Dr. Anderson as well as in corroborating the testimony of witnesses as to the nature of the attack. Under these circumstances, the district court did not err in admitting them.

## (8) THE AIDING AND ABETTING INSTRUCTION

The final argument made by the defendant is that the trial court erred in giving an instruction on aiding and abetting relating to the charge of the first-degree murder of Officer Avery. The defendant contends that there was insufficient evidence to prove that he aided and abetted in the murder. The defendant's objection to the instruction was overruled.

Instruction No. 9, as given to the jury, stated:

"A person who, either before or during its commission, intentionally aids or abets another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed, regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

In Kansas, a defendant charged with the substantive offense may still be convicted of aiding and abetting. *State v. Brinkley,* 256 Kan. 808, 822, 888 P.2d 819 (1995). The trial court does not err in instructing on aiding and abetting when the State has presented

sufficient evidence for the jury to find aiding and abetting. 256 Kan. at 822.

In this case, there was ample evidence to support an aiding and abetting instruction. The evidence presented by the State showed that the defendant, along with a large number of other inmates, attacked and killed Officer Avery. While the defendant argues that a jury may have concluded that he acted alone in striking Officer Avery but did not kill him, so too could the jury have concluded that the defendant knowingly associated himself with other inmates to kill Officer Avery. As a result, the district court did not err in instructing the jury on aiding and abetting.

Affirmed.