COURT OF APPEALS OF VIRGINIA

Present:  Judges Willis, Elder and Senior Judge Cole
Argued at Richmond, Virginia


CARL LEE WILLIAMS
                                          OPINION BY
v.        Record No. 0278-98-2   JUDGE JERE M. H. WILLIS, JR.
                                         MARCH 16, 1999
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                   Donald W. Lemons, Judge

          Cary B. Bowen (Amy M. Curtis; Bowen, Bryant,
          Champlin & Carr, on briefs), for appellant.

          John H. McLees, Jr., Assistant Attorney
          General (Mark L. Earley, Attorney General, on
          brief), for appellee.


     On appeal from his bench trial conviction for murder, in

violation of Code § 18.2-32, robbery, in violation of Code

§ 18.2-58, and statutory burglary, in violation of Code

§ 18.2-91, Carl Lee Williams contends (1) that the trial court

erred in admitting certain evidence, and (2) that the evidence is

insufficient to support his conviction.  We disagree and affirm

the judgment of the trial court.

## I.  Background

          On appeal, we review the evidence in the
          light most favorable to the Commonwealth,
          granting to it all reasonable inferences
          fairly deducible therefrom.  The judgment of
          a trial court sitting without a jury is
          entitled to the same weight as a jury verdict
          and will not be set aside unless it appears
          from the evidence that the judgment is
          plainly wrong or without evidence to support
          it.

Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418

(1987).

On Sunday morning, November 3, 1996, Leslie Anne Coughenour went to work in her Richmond law office. Early Monday morning, November 4, 1996, her dead body was discovered in the office. She had been tied to a chair with a cord from a nearby venetian blind. Her right wrist had been severed, she had been beaten about the head, and her throat had been cut. The cause of death was determined to be asphyxiation, caused by a plastic bag containing a rubber ball which was stuffed in her mouth.

Investigation revealed that an outside window into the men's restroom had been broken. A hole had been knocked through the wall between the women's restroom and the office copy room. The lock on the copy room door had been broken. A boot print was found on a plywood wall in the stairwell.

Missing from the office were two lap-top computers, a computer printer, a black portable CD player housing a CD titled "Classic Cuts," a Rolodex, a pair of binoculars, a small folding multi-purpose tool, and $50 cash. Also missing was jewelry that Ms. Coughenour was wearing when she left home Sunday morning, including a ring described by Ms. Coughenour's friend, Andrea Melillo, as containing diamonds and sapphires. Ms. Melillo identified a photograph of the ring at trial.

Cherry Wright testified that Williams left her birthday party Saturday night, upset that he had no cocaine. He returned to her home Sunday evening with $250 worth of cocaine, a large amount of cash, and some of the electronic equipment stolen from Ms. Coughenour's office. He had sold the rest of the equipment

for the cocaine and cash.  He was wearing a ring, which Ms. Wright testified looked just like the ring worn by the victim.[1] Williams gave Wright a Mickey Mouse watch similar to the one the victim had worn.  He had the victim's ATM card.  The card was used, or its use attempted, four times on the evening of November 3 and once in the afternoon of November 4.

Williams admitted that he frequently did a "B & E" whenever he was low on cash or drugs.  He told Ms. Wright and his girlfriend, Keitha Thomas, that he knew what had happened to the "lady lawyer."  When questioned by police, Williams told them that he was not in Richmond at all during the month of November. He later admitted visiting his probation officer in November.  He testified that he had received the stolen goods from a friend, Mark Cromartie, and that he had borrowed Cromartie's boots because he needed boots for a job.  Cromartie could not be located.

On November 30, 1996, Williams was incarcerated at the Richmond City jail on an unrelated charge.  Examination disclosed that the boot print found on the wall at the law office matched the sole of one of the boots worn by Williams at the time of his November 30 arrest.

---

[1] When Andrea Melillo was asked to describe the ring, she described the jewels as diamonds and sapphires.  When Cherry Wright was shown the same picture of the ring, she described the jewels as diamonds and emeralds.  Neither party noted this discrepancy, either at trial or in this appeal.

## II. Motion to Suppress

Williams moved to suppress evidence relating to the examination of his boot. He contended that the boot was seized in violation of his Fourth Amendment rights and that its examination constituted an unlawful search and seizure. The trial court denied the motion to suppress and admitted into evidence the results of the examination.

When Williams was arrested on November 30 and was committed to jail, his clothing and belongings on his person were taken from him, inventoried, and stored, pursuant to standard procedure. He could have regained possession of his clothing and belongings if he needed them for court dates or upon his release, and he could have directed their delivery to a third party to take home, but otherwise they were not available to him. They were kept in a locked storage room, where each prisoner's property was kept separately. Only authorized jail personnel were allowed in the storage room.

Richmond Police Detective James Hickman received a tip that Williams' boots would match the boot print found at the crime scene. Hickman testified that he did not seek a search warrant because he wanted to protect the identity of the informant. He obtained Williams' boots from the storage room and had their tread compared with the print at the crime scene.

Williams contends that his clothing was held in the storage room for his benefit, that he had a reasonable expectation of privacy in his clothing, and that the warrantless removal of his

boots for inspection constituted an unreasonable search and seizure, violative of his Fourth Amendment rights. This argument raises an issue of first impression in Virginia and one that has not been decided specifically by the United States Supreme Court. However, we find guidance from the decisions of other jurisdictions and from United States Supreme Court decisions addressing parallel issues.

When a person has been lawfully arrested and his property has been lawfully seized by the police pursuant to that arrest, he retains no reasonable expectation of privacy in that property, and later examination of the property by another law enforcement officer does not violate the Fourth Amendment. See United States v. Thompson, 837 F.2d 673, 674 (5th Cir. 1988). The Fourth Amendment protects the privacy rights of persons, not of property. See Oliver v. United States, 466 U.S. 170, 177 (1984); Katz v. United States, 389 U.S. 347, 351 (1967). Once property has been seized incident to a lawful arrest, subsequent examination of that property imposes no greater intrusion upon the privacy interests of the defendant. It would be useless and meaningless to require a warrant under those circumstances. See United States v. Turner, 28 F.3d 981, 983 (9th Cir. 1994); Lockhart v. McCotter, 782 F.2d 1275, 1279-80 (5th Cir. 1986); United States v. Oaxaca, 569 F.2d 518, 524 (9th Cir. 1978); United States v. Jenkins, 496 F.2d 57, 73 (2nd Cir. 1974), cert. denied, 420 U.S. 925 (1975).

In State v. Copridge, 918 P.2d 1247 (Kan. 1996), the defendant, having been arrested on a different charge, became a suspect in a murder case. The police, without a warrant, examined his shoes, which had been in jail custody since his arrest. Upholding the warrantless examination of the shoes, the Supreme Court of Kansas held that the relevant inquiry was not whether the police had probable cause to search the seized shoes, but whether the initial seizure of the shoes was lawful. Id. at 1251. See also United States v. McVeigh, 940 F.Supp. 1541, 1556-58 (D. Col. 1996). An item that has been lawfully seized ceases to be private. See United States v. Burnett, 698 F.2d 1038, 1049 (9th Cir. 1983).

In United States v. Edwards, 415 U.S. 800 (1974), the Supreme Court said:

> [O]nce an accused has been lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the "property room" of the jail, and at a later time searched and taken for use at the subsequent criminal trial.

Id. at 807. Williams seeks to distinguish Edwards, noting that the clothing examination in Edwards related to the charge on which Edwards had been arrested. We find this distinction

- 6 -

insignificant.  The loss of privacy resulting from the initial seizure and the loss of privacy resulting from the subsequent examination are the same regardless of the crime in connection with which the subsequent examination is made.

We hold that Williams enjoyed no expectation of privacy in his boots.  They had been lawfully seized upon his arrest and continued to be seized, in the custody of the sheriff, who had authority to permit their examination.  See United States v. Matlock, 415 U.S. 164, 169 (1974) ("[T]he consent of one who possesses common authority over . . . effects is valid as against the absent, nonconsenting person with whom that authority is shared.").  Because the boots were in the lawful custody of the sheriff, the examination of the boots imposed no greater intrusion on Williams' privacy.

### III.  Sufficiency of the Evidence

Williams contends that the evidence is insufficient to support his conviction.  We disagree.

> Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom.

Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).

The boot imprint left at the scene and the impression made by Williams' boots were virtually identical.  Cuts in the sole of the boots were located in the same place on both the imprint and the analyzed boot.  Williams argues that the boots were not his,

but had been borrowed by him from Cromartie. However, he offered no evidence of this beyond his own testimony. It lay within the province of the trial court to determine his credibility. See Lea v. Commonwealth, 16 Va. App. 300, 304, 429 S.E.2d 477, 479 (1993).

The credibility of Ms. Wright and Ms. Thomas was also properly determined by the trial court. See id. The defense presented evidence of their bias and sought to impeach them, but the trial court chose to believe them.

Williams testified that Cromartie gave him the stolen property. However, the Commonwealth presented overwhelming evidence not only that Williams possessed the property, but also that he lied about how and when he received it and about where he was at the time of the break-in and murder.

Williams argues that the Commonwealth failed to exclude two reasonable hypotheses of his innocence: (1) that the murder had already occurred when he broke into the law office; and, (2) that he and an unknown confederate committed the break-in together, but the other person committed the murder. These hypotheses were not presented at trial and, in any event, are not reasonable.

"The Commonwealth is only required to exclude hypotheses of innocence that flow from the evidence, and not from the imagination of [defense] counsel." Fordham v. Commonwealth, 13 Va. App. 235, 239, 409 S.E.2d 829, 831 (1991).

No evidence suggested that Williams broke in after the murder. Indeed, he denied being there at all.

No evidence suggests that Williams committed the crimes with someone else.  Furthermore, this scenario would not exculpate him, because in that event he would have been a co-perpetrator.

Williams admitted that he often committed break-ins when he needed cash for drugs.  He was out of drugs and cash shortly before the break-in and murder.  Following the crimes, he possessed drugs, money and the property missing from the crime scene.  He lied about how and when he received the stolen property.  He was seen near the law office on the day of the crime.  He repeatedly lied to the police and to others about his whereabouts and actions on November 3, 1996, and the following days.  Thus, the trial court's finding of guilt is supported by the evidence and is not plainly wrong or without evidence to support it.  See Higginbotham, 216 Va. at 352, 218 S.E.2d at 537.

The judgment of the trial court is affirmed.

Affirmed.